# IN THE SUPREME COURT OF IOWA

No. 19–1397

Submitted Tuesday, December 15, 2020—Filed April 9, 2021

**NICOLE BRIBRIESCO-LEDGER,**

Appellee,

vs.

**FRANK J. KLIPSCH,** Mayor, and the **CITY OF DAVENPORT, IOWA,**

Appellants.

---

Appeal from the Iowa District Court for Scott County, Thomas G. Reidel, Judge.

The defendants appeal the district court's denial of summary judgment that held Davenport's mayor was required to show cause to remove an appointee from the Davenport Civil Rights Commission. **REVERSED AND REMANDED WITH DIRECTIONS.**

McDermott, J., delivered the opinion of the court, in which Christensen, C.J., and Mansfield, McDonald, and Oxley, JJ., joined. Appel, J., filed a dissenting opinion. Waterman, J., took no part in the consideration or decision of the case.

Richard A. Davidson and Brett R. Marshall (argued) of Lane & Waterman LLP, Davenport, for appellants.

Michael J. Meloy (argued), Bettendorf, for appellee.

**McDERMOTT, Justice.**

This appeal requires us to answer whether Davenport's mayor may remove an appointee from the Davenport Civil Rights Commission without cause. Mayor Frank Klipsch issued an order removing Commissioner Nicole Bribriesco-Ledger from the commission before her term had expired. Bribriesco-Ledger sued, claiming that without a showing of cause the mayor had no authority to remove her. Klipsch and the City of Davenport filed a motion for summary judgment contending that the law imposed no obligation to show cause for the removal. The district court denied the motion, and Klipsch and the City filed an application for interlocutory review, which we granted.

The Iowa Civil Rights Act imposes certain requirements on cities. At issue in this case is Iowa Code section 216.19(2) (2019), which provides:

> A city with a population of twenty-nine thousand, or greater, shall maintain an independent local civil rights agency or commission consistent with commission rules adopted pursuant to chapter 17A. An agency or commission for which a staff is provided shall have control over such staff. A city required to maintain a local civil rights agency or commission shall structure and adequately fund the agency or commission in order to effect cooperative undertakings with the Iowa civil rights commission and to aid in effectuating the purposes of this chapter.

Davenport's population exceeds the statute's threshold and, in compliance with the associated requirement, the City of Davenport maintains the Davenport Civil Rights Commission. The Davenport Municipal Code requires the mayor to appoint the members of the commission with confirmation by the city council. *See* Davenport, Iowa Municipal Code § 2.58.040 (2019). The term of appointment is two years unless the appointment fills a vacancy for an unexpired term. *Id.*

Klipsch appointed Bribriesco-Ledger to fill a regular two-year term on the Davenport Civil Rights Commission to begin December 1, 2017.

But on April 15, 2019 (and thus before the term expired), Klipsch sent a letter to Bribriesco-Ledger and three other commissioners removing each of them from the commission "[e]ffective immediately." The letter included several pages stating "the reasons" for the action. Four new commissioners were appointed on April 24. Bribriesco-Ledger contested the removal, filing a petition for writ of certiorari and declaratory judgment, and seeking a money judgment for attorney fees and costs, against Klipsch and the City.

Neither the Iowa Civil Rights Act nor the Davenport Municipal Code addresses removal procedures for appointees to the commission. But procedures for "removal of appointees" from city offices *are* set forth in Iowa Code section 372.15, which states:

> Except as otherwise provided by state or city law, all persons appointed to city office may be removed by the officer or body making the appointment, but every such removal shall be by written order. The order shall give the reasons, be filed in the office of the city clerk, and a copy shall be sent by certified mail to the person removed who, upon request filed with the clerk within thirty days of the date of mailing the copy, shall be granted a public hearing before the council on all issues connected with the removal. The hearing shall be held within thirty days of the date the request is filed, unless the person removed requests a later date.

Removal from office under section 372.15 doesn't require that the removal be for cause. *Waddell v. Brooke*, 684 N.W.2d 185, 190 (Iowa 2004); *Bennett v. City of Redfield*, 446 N.W.2d 467, 473 (Iowa 1989); *Scott v. City of Waterloo*, 190 Iowa 467, 469, 180 N.W. 156, 157 (Iowa 1920) (holding that an earlier iteration of the statute "does not require, as a condition precedent, the removal by the mayor of one appointed by him to office that he charge and prove misbehavior").

In its summary judgment ruling, the district court held that section 216.19(2) preempts (as an exception "otherwise provided by state or city

law") the broad removal power granted in section 372.15. Keying in on the word *independent* in the phrase "independent local civil rights agency or commission," the district court applied a definition for *independent* from *Black's Law Dictionary* meaning "[n]ot subject to the control or influence of another." (Alteration in original.) The district court also cited the *Black's Law Dictionary* definition for *independent agency* as "[a] federal agency, commission, or board that is not under the direction of the executive, such as the Federal Trade Commission or the National Labor Relations Board."

The district court cited several federal cases in finding that dismissal *for cause* is a fundamental feature of an independent agency. Finding nothing in the Iowa Civil Rights Act suggesting that our legislature intended to deviate from this feature of agency independence, the district court held that the phrase "independent local civil rights agency or commission" required a showing of cause to remove Bribriesco-Ledger and denied the motion.

In this interlocutory appeal, we review to determine whether the district court made an error of law in its ruling. Iowa R. App. P. 6.907; *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015). No party has raised mootness as a ground to prevent our consideration of this appeal but, as always, "an appellate court has responsibility *sua sponte* to police its own jurisdiction." *Crowell v. State Pub. Def.*, 845 N.W.2d 676, 681 (Iowa 2014). Bribriesco-Ledger's two-year term would have expired in November 2019, arguably making a ruling in her favor now without force or effect. *See Homan v. Branstad*, 864 N.W.2d 321, 328 (Iowa 2015); *see also Young v. Olsen*, 115 N.W. 1020, 1020 (Iowa Apr. 11, 1908) (per curiam) (unpublished table decision) (appeal mooted in opponent's election challenge when the term of office in controversy expired). But we choose

to decide this case on the merits under the "public-importance" exception to our mootness rule. *Homan*, 864 N.W.2d at 330 (describing the factors we consider to determine whether we should exercise our discretion to decide a moot action). We believe this is an issue of sufficient public import, and because the length of time remaining on a removed commissioner's term might often be relatively short, this case presents in particular a situation likely to "recur yet evade appellate review," warranting exercise of the exception to our general rule against deciding moot cases. *Maghee v. State*, 773 N.W.2d 228, 234 (Iowa 2009) (quoting *State v. Hernandez-Lopez*, 639 N.W.2d 226, 234 (Iowa 2002)).

We haven't previously interpreted the meaning of the phrase "independent local civil rights agency or commission" in section 216.19(2). Consistent with the district court's ruling, Bribriesco-Ledger argues that the word "independent," as a descriptor of *agency* or *commission*, connotes a legal term of art in public law that refers to an agency or commission whose core feature is that executive officials may not remove its heads from office except for cause. *See* Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163, 1168–69 (2013). She cites, for example, to *Humphrey's Executor v. United States*, in which the Federal Trade Commission was described as independent because its enacting statute, 15 U.S.C. § 41, permitted removal of Federal Trade Commissioners only for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. 602, 619, 629, 55 S. Ct. 869, 870, 874 (1935) (quoting 15 U.S.C. § 41). This type of "cause" requirement, Bribriesco-Ledger argues, demonstrates that the legislature intended the adjective "independent" in section 216.19(2) to require removal of local civil rights commissioners only for cause.

But Bribriesco-Ledger's argument requires us to work backward, flipping the premise and conclusion. We're not asked to describe an agency as independent *because* its leaders may be removed only for cause; we're asked to find that an agency's leaders may be removed only for cause *because* the agency is described as independent. Reduced to a logical statement, we have "If A, then B." Bribriesco-Ledger asks us to interpret the statute with its converse: "If B, then A."

But her proposed reading fails through an even simpler analysis: the straightforward textual interpretation of the statute. In interpreting a law, the words of the text are of paramount importance. *Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012) [hereinafter Scalia & Garner, *Reading Law*]. Words bear their ordinary meanings unless the context indicates that a technical meaning applies. *Seavert v. Cooper*, 187 Iowa 1109, 1113, 175 N.W. 19, 21 (1919); Scalia & Garner, *Reading Law*, at 73. Bribriesco-Ledger concedes that in no other place in the Iowa Code has the legislature loaded the word "independent" to mean "permitting removal from office only for cause." On the contrary, when the legislature wishes to require removal of commissioners from office only for cause, it explicitly says so. *See, e.g.*, Iowa Code § 13B.8 (local public defender and others removable "for cause" by state public defender); *id.* § 341A.12 (classified civil service employees subject to removal "for cause" by the county sheriff); *id.* § 414.8 (local board of adjustment members removable "for cause" by city councils); *id.* § 602.2101 (judicial branch employees removable "for cause" by the supreme court). And most importantly here, we need look no further for the legislature's use of specific removal-for-cause language than chapter 216 itself. Section 216.3(2) addresses the power to remove commissioners from the state-level Iowa Civil Rights

Commission, and states: "Any commissioner may be removed from office by the governor *for cause.*" Iowa Code § 216.3(2) (emphasis added).

We construe the text of a statute as a whole. *Doe*, 943 N.W.2d at 610; Scalia & Garner, *Reading Law*, at 167. Words and phrases are presumed to bear the same meaning throughout a text. *State v. Richardson*, 890 N.W.2d 609, 619 (Iowa 2017); Scalia & Garner, *Reading Law*, at 170. A material variation in terms suggests a variation in meaning. *Id.* Applying these principles of interpretation, we see a material variation between sections 216.3(2) ("for cause") and 216.19(2) ("independent"). If the legislature meant the same thing, we expect it would have said the same thing. The variation in terms suggests a variation in meaning, and thus "independent" as used in section 216.19(2) can't be read to mean "permitting removal from office only for cause."

There's no definitive list of features of so-called independent agencies—indeed, there's not even a definitive list of agencies that fall within the category of "independent agencies"—from which we could unpack all the features that Bribriesco-Ledger might suggest the word *independent* carries with it. *See* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 785 (2013). But other language in section 216.19(2) seems to undercut Bribriesco-Ledger's interpretation. In the sentence immediately following the requirement to create the "independent local civil rights agency or commission," the statute states: "An agency or commission for which a staff is provided shall have control over such staff." Iowa Code § 216.19(2). If the word "independent" actually carried the considerable load that Bribriesco-Ledger contends it does—with all its built-in components of autonomy from outside interference that come from invocation of that word alone—there presumably would be no need to

specify that the agency is to have control of its own staff. We interpret every word and every provision of a statute to give it effect, if possible. *Maguire v. Fulton*, 179 N.W.2d 508, 510 (Iowa 1970); Scalia & Garner, *Reading Law*, at 174. Bribriesco-Ledger's proposed interpretation clashes with this interpretative principle, as it would tend to make superfluous the second sentence.

But if "independent" doesn't mean or embrace the concept of "removal from office only for cause," then what does it mean? It can't simply mean "local," as that word is already directly stated ("independent local civil rights agency or commission") and would render the word with no effect. *See id.* The answer, we believe, is found in the second and third definitions of *independent* in *Black's Law Dictionary*: "Not associated with another (often larger) entity <an independent subsidiary>," and "Not dependent or contingent on something else <an independent person>." *Independent, Black's Law Dictionary*, at 919–20 (11th ed. 2019). Applying these closely-connected definitions to section 216.19 gives us a reading such that the local-level civil rights commission is not just local, but not associated with, and not dependent or contingent on, other city departments or the state-level civil rights commission. Such an interpretation seems to us the best, fairest reading of the statute in its full context. Unlike Bribriesco-Ledger's proffered interpretation, such a reading comports with the second sentence of the subsection quoted above, and also with the third sentence, which requires the City to "structure and adequately fund the agency or commission," while allowing the local commission to engage in "cooperative undertakings" with the state-level commission to effectuate the purposes of the Iowa Civil Rights Act.

This interpretation also aligns with the definition of "independent agency" in Iowa Code section 7E.4. That statute provides definitions for executive branch organizations and defines an independent agency as "an administrative unit which, because of its unique operations, does not fit into the general pattern of operating departments." Iowa Code § 7E.4(9). The legislature added this definition of "independent agency" in section 7E.4 in 1986; it added the "independent local civil rights agency or commission" language to section 216.19 not long after, in 1990. Applying section 7E.4's definition of an independent agency as not part of the general pattern of operating departments of local government (police, fire, parks and recreation departments, etc.) aligns with the interpretation of "independent" we've articulated here. The definition in section 7E.4 includes nothing to suggest, let alone mandate, a for-cause removal requirement.

Likewise, section 216.19 requires the City to maintain the independent local civil rights agency or commission "consistent with commission rules adopted pursuant to chapter 17A." *Id.* § 216.19(2). The Iowa Civil Rights Commission has adopted almost 100 pages of administrative rules. *See generally* Iowa Admin. Code Civil Rights Commission [161] (2020). No rule limits the grounds for termination of a local civil rights commissioner.

The suggestion that permitting terminations without cause puts too much power in the hands of a single political official such as a mayor fails to consider that, under the Iowa Constitution's home rule amendments, cities may select among eight different forms of city government. Iowa Const. art. III, §§ 38A, 39A; Iowa Code § 372.1. A mayor–council structure is one form, but cities may also choose forms that disperse power among many more people, such as a commission structure, a council–manager-

at-large structure, a council–manager–ward structure, and so on. *See* Iowa Code § 372.1. To suggest we must interpret the statute to require for-cause removal because it cloaks one official with too much power over local civil rights commissions ignores that removal decisions might in fact be spread among a disparate (and discordant) body of local government officials. *See id.*

An appointing power comes with removal authority unless the law otherwise provides. *LaPeters v. City of Cedar Rapids*, 263 N.W.2d 734, 736 (Iowa 1978). Section 216.19(2) doesn't otherwise provide, and thus doesn't preempt the removal power the legislature granted to the mayor in section 372.15. We will not imply for-cause removal protections for independent local civil rights commissions where the legislature has crafted the law as it has.

Because the law imposed no obligation on Klipsch to show cause for Bribriesco-Ledger's removal from the commission, the district court erroneously denied the defendant's motion for summary judgment on this basis. We thus reverse the district court's order denying the motion for summary judgment and remand the case for further proceedings consistent with this ruling.

**REVERSED AND REMANDED WITH DIRECTIONS.**

Christensen, C.J., and Mansfield, McDonald, and Oxley, JJ., join this opinion. Appel, J., files a dissenting opinion. Waterman, J., takes no part.

**APPEL, Justice (dissenting).**

I respectfully dissent. The majority is untethered from the history of the development of independent agencies and the historic caselaw recognizing the need to protect decision-makers in independent agencies through protection from termination without cause. The bottom line is that history, caselaw, and administrative law authorities converge to demonstrate what one leading scholar has proclaimed: the term "independence" is a term of art in administrative law and signifies an agency where key decision-makers are subject to termination only for cause. *See* Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163, 1168–69 (2013) [hereinafter Vermeule]. Yet the majority endorses the intervention of the Mayor of Davenport to fire commissioners without cause prior to the expiration of their terms to prevent the "independent" commission from considering taking an action that is specifically authorized by the Davenport Civil Rights Ordinance, namely, bringing an action to enforce the Davenport Ordinance against the City of Davenport. It is undisputed that the case involves the attempted firing of commissioners by the Mayor of Davenport in order to head off a potential enforcement action by the commission against the City.

In addition, this case, when combined with our other cases, reflects a disturbing trend to undercut the power of local commissions under the Iowa Civil Rights Act. In *Petro v. Palmer College of Chiropractic*, this court held that local agencies did not have the power to issue right to sue letters, 945 N.W.2d 763, 769–79 (Iowa 2020), thus leaving a complainant "high and dry" if the agency, for whatever reason, declined to act, *id.* at 792 (Appel, J., concurring in part and dissenting in part). By preventing

complainants from obtaining a right to sue letter from local commissions, this court dramatically reduced the ability of an individual to obtain redress from a local commission. *Id.* at 781–92. Only a handful of claims can possibly be pursued by even the most diligent and conscientious commission. *Id.* at 788. As a result of *Petro*, a potentially meritorious claim under a local ordinance will die on the vine due to commission inaction. *Id.* at 788, 791. Indeed, that is exactly what happened in *Petro*, where the commission staff found probable cause, the commission elected not to proceed, and Petro's claim under the Davenport Civil Rights Ordinance was thereby extinguished as a result of bureaucratic inaction. *Id.* at 791–92.

The impact of the unfortunate decision in *Petro* has now been geometrically increased by the majority's determination that the Mayor of Davenport can fire members of the "independent" commission before their terms have expired in order to head off potential commission action against the City of Davenport that is expressly authorized by the underlying Ordinance.

Combined with *Petro*, today's decision sends a clear message to complainants: if you file a claim with a local civil rights agency, (1) your potentially meritorious complaint under the local ordinance may be summarily and without explanation extinguished through commission inaction, and (2) a potential defendant that gets wind of potential commission action has a political remedy—convince the mayor to fire the commissioners supporting the potential action.

In reaching the result in this case, the majority narrowly construes the term "independent" in the Iowa Civil Rights Act and politicizes the local civil rights commission by giving the mayor the power to fire civil rights commissioners without cause. Not only is this development the antithesis

of generally applicable administrative law, it ignores the historical fact that the Iowa Civil Rights Commission was created because politically controlled civil rights enforcement proved entirely inadequate. The effect of the majority decision turns this history on its head and requires the local civil rights commissions to ride a "way back" machine back to the 1950s with politically controlled civil rights enforcement. The legislature mandated that the Iowa Civil Rights Act "shall be construed broadly to effectuate its purposes." 1965 Iowa Acts ch. 121, § 11 (originally codified at Iowa Code § 105A.11 (1966), now codified as amended at Iowa Code § 216.18(1) (2019)). Today, it is construed narrowly to defeat its purpose of achieving effective civil rights enforcement.

For the reasons expressed below, I simply cannot agree.

**I. Factual and Procedural Background.**

**A. Factual Background.** The Iowa Civil Rights Act was originally enacted in 1965. *Id.* §§ 1–15 (originally codified at Iowa Code ch. 105A (1966), now codified as amended at Iowa Code ch. 216 (2019)). Under the act as amended in 1990, localities with populations in excess of 29,000 were required to establish "an *independent* local civil rights agency or commission." 1990 Iowa Acts ch. 1166, § 1 (originally codified at Iowa Code § 60A.19 (1991), now codified as amended at Iowa Code § 216.19(2) (2019)) (emphasis added). In addition to expressly requiring that the local agency be "independent," the Iowa Civil Rights Act ensures that the agency or commission have control of staff and that the staff of the local agency or commission and the city must "structure and adequately fund the agency" to effectuate the purposes of the Act. Iowa Code § 216.19(2)

The City of Davenport created such a commission through enactment of a local ordinance. Davenport, Iowa, Municipal Code §§ 2.58.010–2.58.380 (2019). The Davenport Municipal Ordinance seeks:

> To secure for all individuals within the City freedom from discrimination because of race, color, religion, creed, sex, national origin or ancestry, familial status, marital status, age, mental or physical disability, gender identity, or sexual orientation, in connection with employment, public accommodations, housing, education, and credit . . . .

*Id.* § 2.58.010(A). For purposes of the Ordinance, "employer" means "the city or any political subdivision, board, commission, department, institution, or school district therein, and every other person employing employees within the city." *Id.* § 2.58.030(J). The commission is authorized to receive complaints, conduct investigations, hold hearings, and enforce the terms of the Ordinance through imposing various remedies and court action. *Id.* §§ 2.58.150–2.58.190.

Under the Ordinance, the commission consisted of seven members "representative of the community and the various racial, religious, cultural and social groups within it." *Id.* § 2.58.040(A). The members of the commission are appointed by the Mayor of Davenport and confirmed by the city council for a fixed term of two years. *Id.*

On April 15, 2019, Davenport Mayor Frank Klipsch sent a letter to four Davenport Civil Rights Commission members purporting to officially remove them from their positions prior to the expiration of their terms. According to the letter, the four commissioners engaged in a series of closed meetings to consider whether to "discuss initiating litigation" against the City of Davenport. The mayor's letter asserted that the Davenport Civil Rights Commission "is not a separate legal entity apart from the City of Davenport such that it has the ability to sue or be sued." The mayor maintained that in a series of meetings, the commission committed prohibited labor practices, violated the Iowa Open Meetings Act, and allowed three persons who were no longer commissioners to participate and vote. The mayor claimed that the commission improperly

refused to respond to an open records request in violation of the law. The mayor asserted that the four members of the commission refused to recognize his recent appointment of three new members. The mayor's letter stated that the removed commissioners were entitled to a hearing pursuant to Iowa Code section 372.15. Bribriesco-Ledger requested the hearing. A hearing was held on June 7, 2019.

**B. Prior Proceedings.** After receiving the April 15 letter, Nicole Bribriesco-Ledger filed an action in district court against Mayor Klipsch seeking a preliminary injunction, writ of certiorari, and declaratory judgment. The petition claimed that Mayor Klipsch's action immediately removing Bribriesco-Ledger from the commission was illegal, violated the First Amendment rights of the commissioners, and was because of race, sex, and sexual orientation. The petition asserted Bribriesco-Ledger could not be removed except for cause until after they receive a due process hearing before a neutral body.

The court granted the writ of certiorari. Mayor Klipsch then moved for summary judgment. The gist of the mayor's motion was that members of the commission serve at the pleasure of the mayor and could be removed at will. The mayor cited Iowa Code section 372.15, which provides, "Except as otherwise provided by state or city law, all persons appointed to city office may be removed by the officer or body making the appointment, but every such removal shall be by written order." Bribriesco-Ledger maintained that under Iowa Code section 216.19(2), the Davenport Civil Rights Commission is an "independent local civil rights agency or commission." As an independent local civil rights commission, Bribriesco-Ledger argued that members of the commission can be removed only for cause.

The district court denied the mayor's motion for summary judgment. The district court emphasized that the Iowa Civil Rights Act requires Davenport to maintain "an independent local civil rights agency or commission." Iowa Code § 216.19(2). The court cited Black's Law Dictionary for the proposition that an "independent" agency is one not under the control of the executive. *See Independent, Black's Law Dictionary* (11th ed. 2019). Citing a line of cases and scholarly authority, the district court stated that it has long been established that dismissal for cause is a fundamental feature of the legal concept of agency independence. *See, e.g., Humphrey's Ex'r v. United States*, 295 U.S. 602, 629, 55 S. Ct. 869, 874 (1935); *Collins v. Mnuchin*, 896 F.3d 640, 649 n. 47 (5th Cir. 2018) (per curiam); *Ford v. Blagojevich*, 260 F. Supp. 2d 700, 707 (C.D. Ill. 2003). The district court also noted that under Iowa Code section 216.3(3), the members of the Iowa Civil Rights Commission may only be removed by the Governor and only for cause. The district court reasoned that this passage indicates what the legislature meant by "an independent local civil rights agency or commission" in Iowa Code section 216.19(2).

**II. Growth and Development of *Independent* Government Agencies.**

The growth of independent agencies can be traced to the creation of state railroad commissions in the Reconstruction Era and the Interstate Commerce Commission (ICC) in 1887. *See* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 776 (2013). With respect to the ICC, the focus of the debates was more on the need for expert, impartial decision-making than on political independence. *See id.*

But during the Progressive Era, a host of independent agencies emerged where the notion of independence was an important rationale for their creation. *See* Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1130–31 (2000) [hereinafter Breger & Edles]. To the progressives, the independent agency was seen as "an institution capable of compensating for the shortcomings of the 'political' institutions of American government." *Id.* (quoting Marc Allen Eisner, *Regulatory Politics in Transition* 44 (1st ed. 1993)).

In 1914, Congress created the Federal Trade Commission (FTC). *Id.* at 1132. The FTC was insulated from political control by fixed seven-year terms and a provision that commissioners could be removed by the President only for cause. *See id.* at 1267–69. It is clear that among the purposes of the FTC was to remove regulation of business from the political fray and establish a quasi-judicial framework. *See id.* at 1132–33.

During the Progressive Era and extending into the New Deal, Congress established a number of agencies along the progressive model, including the Federal Reserve Board, the Federal Radio Commission, the Federal Power Commission, the Securities and Exchange Commission, the Federal Communications Commission, and the National Labor Relations Board. *Id.* at 1116 n.14.

**III. Independence as a Term of Art in Administrative Law Implying For Cause Termination Protection for Multi-Member Agencies.**

**A. Introduction**. A key legal question surrounding the Progressive Era and New Deal administrative agencies was whether members of multi-member agency boards were subject to removal for cause by the President. As a result of the extensive and well known litigation, the term

"independent" and its derivatives, in the context of administrative law, has become a term of art.  As will be demonstrated below, *independence* for an agency, as a term of art, meant, at a minimum, that its members were subject to removal only for cause, just as the district court held in this case.

**B. United States Supreme Court Precedents.**

1. Myers v. United States*:  Striking down the congressional role in the removal of executive officers.*  The United States Supreme Court did not consider the power of the President to remove officials that the President appointed subject to Senate confirmation until *Myers v. United States*.  272 U.S. 52, 106, 47 S. Ct. 21, 22 (1926).  In *Myers*, the Supreme Court considered whether a postmaster appointed by the President and confirmed by the Senate could be removed by the President even though the relevant statute required the advice and consent of the Senate for such a removal.  *Id.* at 106–08, 47 S. Ct. at 22.  In a lengthy opinion by Chief Justice Taft, the Supreme Court concluded that the President had the power to terminate the postmaster and that the statute requiring Senate consent to the termination was unconstitutional.  *Id.* at 176, 47 S. Ct. at 45.

Not surprisingly, Justice Brandeis, a product of the Progressive Era, and advocate of Brandeis briefs which are meant to objectively present science to the court, dissented.  *Id.* at 240–95, 47 S. Ct. at 66–85 (Brandeis, J., dissenting).  Brandeis found lessons in history different from the *Myers* majority.  *Id.*  The great Justice Holmes also dissented, making the theoretical point that Congress created the office in question, had the power to abolish the office in its entirety, and therefore had the power to limit removal of a duly appointed and confirmed postmaster.  *Id.* at 295, 47 S. Ct. at 85 (Holmes, J., dissenting).  Justice McReynolds dissented as

well, largely based on his historical review of the President's constitutional powers. *Id.* at 178–239, 47 S. Ct. at 46–66 (McReynolds, J., dissenting).

2. Humphrey's Executor*: Approving congressional limitations of presidential removal power in cases involving independent agencies.* The decision in *Myers* appeared to be a sweeping, if controversial, victory for executive power. But the approach in *Myers* was soon overtaken and largely obliterated by the Supreme Court in one of the most famous administrative law cases, *Humphrey's Executor v. United States.* 295 U.S. 602, 55 S. Ct. 869. The question in that case was whether President Roosevelt had the power to remove an FTC commissioner without cause. *Id.* at 618–19, 55 S. Ct. at 870. In an about face from the approach in *Myers*, the Supreme Court concluded that the President could not so remove an FTC commissioner. *Id.* at 631–32, 55 S. Ct. at 875.

The issue in *Humphrey's Executor* was somewhat different than that presented in *Myers*. In *Humphrey's Executor*, the FTC statute did not require Senate approval of removal, but instead expressly purported to limit the power of the President to remove an FTC commissioner to cases involving "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 621–23, 55 S. Ct. at 871–72.

In *Humphrey's Executor*, President Roosevelt first wrote Humphrey urging him to resign. *Id.* at 618, 55 S. Ct. at 870. Roosevelt did not disparage Humphrey's performance in office, but advised Humphrey that he wanted FTC commissioners of his own selection. *Id.* Instead, Roosevelt simply stated that "I do not feel that your mind and my mind go along together on either the policies or the administering of the Federal Trade Commission, and, frankly, I think it is best for the people of this country that I should have a full confidence." *Id.* at 619, 55 S. Ct. at 870. When Humphrey refused to resign, Roosevelt moved to plan B, sending him a

letter brusquely declaring that "Effective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." *Id.*

In a unanimous opinion written by Justice Sutherland, the Supreme Court upheld the constitutionality of the statute limiting the power of the President to remove FTC commissioners. *Id.* at 626–32, 55 S. Ct. at 873–75. The Supreme Court emphasized that the duties of the FTC were "quasi judicial and quasi legislative." *Id.* at 624, 55 S. Ct. at 872. The FTC was "to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality." *Id.*

The Supreme Court drew from legislative history to support its view that the limitations on removal in the statute passed constitutional muster. *Id.* at 624–26, 55 S. Ct. 872–73. The Supreme Court cited a Congressional Report quoting Senator Newlands, who declared that the FTC "should be of high character and 'independent of any department of the government . . . a board or commission of dignity, permanence, and ability, independent of executive authority, except in its selection, and independent in character.'" *Id.* at 625, 55 S. Ct. at 872 (omission in original). The Court cited and quoted debates as demonstrating the prevailing view that the FTC was to be "free from 'political domination or control.'" *Id.* at 625, 55 S. Ct. at 872–73.

In the end, the Supreme Court concluded that the language of the act, the legislative reports, and the general purposes of the legislation reflected in debates, demonstrated a legislative intent to create "a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Id.* at 625–26, 55 S. Ct. at 873.

The Supreme Court next turned to considering the impact of *Myers* on the case. *Id.* at 626–32, 55 S. Ct. at 873–75. The Supreme Court dramatically limited its scope. *Id.* It emphasized that in *Myers*, the position of postmaster was an executive position and that unlimited presidential removal power extended only to "purely executive officers." *Id.* at 627–28, 55 S. Ct. at 874. But in *Humphrey's Executor*, the Supreme Court stated, the FTC acts "in part quasi legislatively and in part quasi judicially." *Id.* at 628, 55 S. Ct. at 874. The Supreme Court asked the rhetorical question of whether only judicial officers are protected from removal. *Id.* at 629, 55 S. Ct. at 874. The Supreme Court answered this question with a resounding no:

> The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime. *For it is quite evident that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will.*

*Id.* (emphasis added). The President's claim of unfettered removal authority could not be sustained because "its coercive influence threatens the independence of a commission." *Id.* at 630, 55 S. Ct. at 875.

*Humphrey's Executor* was a seminal case with broad impact on administrative law. After the decision, for cause removal became "*a symbol of independence* for all members of similar regulatory independent agencies and commissions." J. Forrester Davison, *The Place of the Federal Trade Commission in Administrative Law*, 8 Geo. Wash. L. Rev. 280, 287 (1940) (emphasis added).

3. Wiener v. United States*: Limitations on presidential removal powers as a key feature of independent agencies.* The last case in the

famous trilogy of administrative law cases involving termination of members of independent agencies is *Wiener v. United States*. 357 U.S. 349, 78 S. Ct. 1275 (1958). The *Wiener* case involved a claim for backpay based on the petitioner's alleged illegal removal as a member of the War Crimes Commission. *Id.* at 349, 78 S. Ct. at 1276. The Commission consisted of three members, two of whom were required to be members of the bar, appointed by the President. *Id.* at 350, 78 S. Ct. at 1276. The Commission was empowered to receive and adjudicate "claims for compensating internees, prisoners of war, and religious organizations who suffered personal injury or property damage at the hands of the enemy in" World War II. *Id.* (citations omitted).

The Commission was directed to wrap up its work no "later than three years after the expiration of the" filing of claims, but Congress extended the deadline twice. *Id.* The terms of Commission members were thus limited by the life of the Commission. *Id.* Unlike the situation in *Humphrey's Executor*, Congress made no express provision limiting the power of the President to remove a commissioner. *Id.*

President Truman originally appointed Wiener as a commissioner. *Id.* Weiner was confirmed by the Senate. *Id.* As in *Humphrey's Executor*, President Eisenhower upon his arrival in office asked for a resignation from Wiener. *Id.* Wiener declined. *Id.* Like Roosevelt before him in *Humphrey's Executor*, President Eisenhower then sent a letter to Wiener purporting to remove him from the Commission in order to permit him "to complete the administration of the War Claims Act . . . with personnel of my own selection." *Id.*

The question in *Wiener* was what to make of congressional silence on the question of removal of members of the Commission. *Id.* at 352–53, 78 S. Ct. at 1277–78. Justice Frankfurter declared that the most reliable

factor to consider was "the nature of the function that Congress vested in the War Claims Commission." *Id.* at 353, 78 S. Ct. at 1278. Justice Frankfurter emphasized that the War Claims Commission was "established as an adjudicating body" designed to adjudicate claims. *Id.* at 354–55, 78 S. Ct. at 1279. Noting the adjudicative responsibilities of the Commission, Justice Frankfurter wrote:

> If . . . the War Claims Act precluded the President from influencing the Commission in passing on a particular claim, a fortiori must it be inferred that Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing.

*Id.* at 356, 78 S. Ct. at 1279.

As a result, the Supreme Court in *Wiener* concluded that even where the legislation was silent regarding the ability of the Executive to remove a commissioner, a for cause removal standard would be implied where the Commission engaged in quasi-legislative or quasi-judicial functions. *Id.* As noted by a leading commentator, the *Wiener* decision was presumed to extend to other independent agencies even where the statute lacked an explicit for cause removal protection. *See* Paul R. Verkuil, *Jawboning Administrative Agencies: Ex Parte Contacts by the White House*, 80 Colum. L. Rev. 943, 953–56 (1980).

4. *Post-*Wiener *cases:* Bowsher *and* Morrison. In recent years, the Supreme Court has decided several cases relating to the power of the President to *remove* various officials. In *Bowsher v. Synar*, the Supreme Court revisited the question of whether Congress could reserve to itself a role in determining whether an executive officer could be removed. 478 U.S. 714, 717, 106 S. Ct. 3181, 3183 (1986). Relying on *Myers*, the Supreme Court said no. *Id.* at 726, 106 S. Ct. at 3187–88.

In the next case, *Morrison v. Olson*, the Supreme Court considered the constitutionality of a statute that limited the power of the President to remove independent counsel only for cause. 487 U.S. 654, 660–669, 108 S. Ct. 2597, 2603–07 (1988). The Supreme Court upheld the limitation. *Id.* at 696–97, 108 S. Ct. at 2622. In *Morrison*, the Supreme Court departed somewhat from the rigid formulation in *Humphrey's Executor* that suggested that for executive positions, removal for cause would invade separation of power. *Id.* at 690, 108 S. Ct. at 2618–19. The *Morrison* Court also refused to find that a "good cause" standard for removal of an inferior executive officer "unduly trammels" the need to control the exercise of executive discretion. *Id.* at 691, 108 S. Ct. at 2619. According to the *Morrison* Court, the power to terminate an inferior executive official for good cause provides the Executive with ample authority to ensure that the counsel is competently performing his duties. *Id.* at 691–93, 108 S. Ct. at 2619–20. Clearly, the core holdings of *Humphrey's Executor* and *Wiener* remained in place and, if anything, the holding in *Morrison* extended the power of Congress to protect Executive Branch officials from termination without cause.

5. *Recent cases.* The Supreme Court returned to the question of presidential power to terminate officers in *Free Enterprise Fund v. Public Co. Accounting Oversight Board.* 561 U.S. 477, 130 S. Ct. 3138 (2010). In *Free Enterprise Fund*, the relevant congressional legislation created a dual for cause limitation on removal of members of the Public Company Accounting Oversight Board. *Id.* at 483–84, 130 S. Ct. at 3147. The Court noted that under the statute, the President could not remove a member of the Board for "good cause" as permitted under caselaw. *Id.* at 492–98, 3151–55. As a result, the statute violated Article II which vested executive power in the President. *Id.*

The last case of relevance is *Seila Law LLC v. Consumer Financial Protection Bureau.* ___ U.S. ___, 140 S. Ct. 2183 (2020). In *Seila Law LLC*, the Supreme Court held that the for cause restriction on presidential removal of a single director supervising a sprawling agency with many executive functions violated separation of powers but was severable from the underlying legislation. *Id.* at ___, 140 S. Ct. at 2197–2211. The *Seila Law LLC* Court emphasized that it did not revisit *Humphrey's Executor* or any other precedent. *Id.* at ___, 140 S. Ct. at 2206.

6. *Conclusion.* Notwithstanding the retreat in *Seila Law LLC*, the gist of the administrative law concept that the members of independent multi-member agencies were not subject to removal without cause remained intact. As a result, the fact that the term "independent" and its derivatives have a special meaning when used in a statute involving an agency or commission is an indispensable requirement in statutory interpretation. *See* Vermeule, 113 Colum. L. Rev. at 1168–74, 1204–14.

**C. State Supreme Court Precedents.** State agency law is not as well developed as federal law. But, as noted by one of the leading authorities in statutory interpretation, "[s]tate courts have consistently refused to imply the removal power from the power of appointment, as the federal courts have done." 1 Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 3.23, at 103 (7th ed. 2010). Thus, the premise of *Myers* is often not the starting point in state law. Nonetheless, ample state court precedent links the removal power to agency independence.

For example, caselaw in Pennsylvania explores what is required to ensure agency independence. In *Bowers v. Pennsylvania Labor Relations Board*, the Governor sought to remove a member of the Pennsylvania Labor Relation Board without cause. 167 A.2d 480, 481 (Pa. 1961). The *Bowers*

court noted that under the Pennsylvania Constitution, the legislature "may impose such terms and limitations" with respect to "tenure or removal of an incumbent as it sees fit." *Id.* at 481–82; *see also Watson v. Pa. Turnpike Comm'n*, 125 A.2d 354, 356 (Pa. 1956). Whether the legislature has imposed a "for cause" requirement for termination is therefore a "pure question of statutory construction which is peculiarly and exclusively the function of the judiciary to resolve." *Bowers*, 167 A.2d at 482.

In *Bowers*, the legislature did not expressly declare that members of the board could only be removed for cause, but provided that members were appointed for fixed and staggered terms. *Id.* at 483–84. But, according to the *Bowers* court, the board exercised judicial powers. *Id.* at 486. The *Bowers* court cited *Wiener* and *Humphrey's Executor* for the proposition that where a board is invested with judicial powers, the chief executive lacks the power to remove appointed members without cause. *See id.* at 484–86.

In holding that board members could be removed only for cause, the *Bowers* court declared:

> It is implicit as well as inherent in any just system of law that a party complaining of, or charged with, the commission of wrongs legally redressable, be entitled, at the very least, to a determination by a tribunal independent of the influence of powerful personages, political or otherwise.

*Id.* at 486.

The *Bowers* court further made the comparison of members of adjudicative boards to judges, whose independence was expressly recognized in article VI, section 4 of the Pennsylvania Constitution. *Id.* at 486–87. The *Bowers* court recognized that the independence of administrative agencies with adjudicative powers was not expressly recognized in the constitutional provision, but emphasized that such

agencies did not exist at the time the constitution was enacted. *Id.* at 487. The *Bowers* court concluded by holding that because the Pennsylvania Labor Relations Board performed adjudicative functions, the Governor was without the power to remove a member of the board at his pleasure. *Id.*

Finally, in *Arneson v. Wolf*, the Commonwealth Court of Pennsylvania considered whether an executive director of the Office of Open Records was subject to removal without cause. 117 A.3d 374, 376 (Pa. Commw. Ct. 2015). According to the *Arneson* court, "When the legislature creates an independent administrative agency that exercises quasi-judicial functions, this is a strong indicator that the legislature intended that the agency's members be removed only for cause." *Id.* at 385. Citing *Chisholm v. Defense Logistics Agency*, 656 F.2d 42, 47 (3d Cir. 1981), the *Arneson* court noted that "[w]hen an administrative agency acts as a quasi-judicial body, it fulfills the same function as a court, seeking to make a determination which is consistent with the public interest as reflected in the governing statute." *Arneson*, 117 A.3d at 387 (quoting *Chisholm*, 656 F.2d at 47). The *Arneson* court determined that the Governor did not have the power to remove the executive director without cause. *Id.* at 395–96.

The Supreme Court of Illinois has considered the question of whether the Governor could remove a member of the State Board of Elections in *Lunding v. Walker*. 359 N.E.2d 96, 96–97 (Ill. 1976). The Supreme Court of Illinois generally adopted the approach of the *Myers-Humphrey's Executor-Wiener* trilogy. *Id.* at 99–102. The *Lunding* court emphasized the need for an independent Board of Elections free from political control. *Id.* at 101. The *Lunding* court declared:

> It is plain that the legislators intended, and the public interest demands, that Board members not be amenable to political influence or discipline in the discharge of their official duties.

> To subject a neutral, bipartisan, and independent board to the unbridled whim of the Governor . . . would destroy its purpose and its efficacy.

*Id.* The *Lunding* court held that the question of whether the failure of a board member to file a financial disclosure form amounted to cause for removal was a question subject to judicial review. *Id.* The approach in *Lunding* was followed by a federal district court in *Ford v. Blagojevich.* 282 F. Supp. 2d 898, 904–05 (C.D. Ill. 2003) (holding that a commissioner of the Illinois Industrial Commission may only be removed for cause following Illinois precedent post-*Lunding*).

**D. Academic Commentary Welding For Cause Removal to Agency Independence.**

1. *Theory of avoiding political influence.* Academic commentators have synthesized the caselaw and developed rationales for independent agencies and commissions. Reprising a theme of reformers in the Progressive Era, a primary theme of the commentators involves the need for independent agencies to be independent of politics. As noted by Rachel E. Barkow, the hope is that insulated agencies "will better resist short-term partisan pressures and instead place more emphasis on empirical facts that will serve the public interest in the long term." Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 17 (2010). And, as Professor Barkow further observes, "the creation of an independent agency is often motivated by a concern with agency capture." *Id.* She notes that risk of agency capture is "further exacerbated by the fact that industry groups are . . . well positioned to contribute to political campaigns and to lobby." *Id.* at 22.

Other distinguished scholars of administrative law have expressed similar views. For example, Paul Verkuil, notes that the characteristics of

independent agencies are designed "to isolate those decisionmakers from politics." Paul R. Verkuil, *The Purposes and Limits of Independent Agencies,* 1988 Duke L.J. 257, 259–60 [hereinafter Verkuil]. Similarly, Marshall J. Breger and Gary J Edles have declared that a founding purpose of independent agencies was to insulate them "from the political melee." Breger & Edles, 52 Admin. L. Rev. at 1131.

Administrative law scholars often draw comparisons between independent agencies and the courts. Paul Verkuil has declared that "independent agencies emulate[d] our most revered collegial bodies—the courts, or, more precisely, the appellate courts." Verkuil, 1988 Duke L.J. at 261. Verkuil finds the analogy between independent administrative agencies and the court "compelling," noting that the first chair of the Interstate Commerce Commission (ICC) was Michigan Supreme Court Justice Thomas Cooley, whose reputation for independence and integrity had much to do with the acceptance of the ICC. *Id.* & n.17.

As Professor Verkuil further establishes, Congress has recognized the value of independent agencies by analogy to the courts. *Id.* at 275–78. As noted by the Senate Committee on Governmental Affairs and cited by Verkuil, "[i]ndependence does have its positive advantages. First and perhaps most important, these commissions exercise quasi-judicial functions in that they adjudicate and reach decisions on particular cases." *Id.* at 276 n.85 (quoting 5 S. Comm. on Gov't Affs., *Study on Federal Regulation: Regulatory Organization,* S. Doc. No. 91, at 75 (1st Sess. 1977)).

2. *Implementation of the theory by removal for cause.* If there is consensus among commentators that independent agencies are designed to be free from political will and should engage in their adjudicative processes in a fashion similar to courts, how is that to be accomplished?

There is nearly complete agreement that one ingredient of an independent agency, and indeed an essential one, is removal of key agency decision makers only for cause. As noted by Professor Vermeule, "[c]ommentators broadly agree that for-cause tenure protection is the sine qua non of agency independence . . . the doctrine [of agency independence] clearly makes for-cause tenure protection critical." Vermeule, 113 Colum. L. Rev. at 1168–69. Professors Breger and Edles emphasize that "the critical element of independence is the protection . . . against removal except 'for cause.'" Breger & Gary, 52 Admin. L. Rev. at 1138. Prior to her nomination to the Court, Elena Kagan wrote that independent agencies are "agencies, whose heads the President may not remove at will" and "whose heads have substantial protection from presidential removal." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2247, 2250 (2001). Another scholar has noted removal is "the classic indicator of independence under federal law." Miriam Seifter, *Understanding State Agency Independence*, 117 Mich. L. Rev. 1537, 1568 (2019). Or, as noted by yet another commentator, "[t]he very definition of an independent agency is an agency with a head or board that the President can remove only for cause." Note, *Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection*, 125 Harv. L. Rev. 1822, 1822 (2012); *see also* Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 Vand. L. Rev. 599, 610 (2010) ("[W]hat gives agencies their independence or what otherwise distinguishes them from their executive-branch counterparts . . . [is that] the President lacks authority to remove their heads from office except for cause."); Emily Hammond Meazell, *Presidential Control, Expertise, and the Deference Dilemma*, 61 Duke L.J. 1763, 1777 (2012) ("[I]ndependent agencies are headed by

multimember groups of people who are removable only for cause."); Angel Manuel Moreno, *Presidential Coordination of the Independent Regulatory Process*, 8 Admin. L.J. Am. U. 461, 469 n.39 (1994) ("Immunity from discretionary removal power is a 'condition sine qua non' of independence."); Richard Rothman & Katelin Shugart-Schmidt, *Lying in Wait: How a Court Should Handle the First Pretextual For-Cause Removal*, 86 Geo. Wash. L. Rev. 1348, 1353–54 (2018) ("[T]he existence of for-cause removal limitations for the head (or heads) of an agency is considered a defining feature of 'independent agencies.' ").

**E. Independence as a Legal Term of Art in Public Law.** The substantial body of decades of caselaw and commentary has been woven into the fabric of administrative law. As noted in the literature, "[i]ndependence is a legal term of art in public law, referring to agencies headed by officials that the President may not remove without cause. Such agencies are, by definition, independent agencies; all other agencies are not." Vermeule, 113 Colum. L. Rev. at 1168 (alteration in original) (quoting Jacob E. Gersen, *Designing Agencies*, *in* Research Handbook on Public Choice and Public Law 333, 347 (Daniel A. Farber & Anne Joseph O'Connell eds., 2010)). As a result, the fact that the term independent and its derivatives have a special meaning when used in a statute involving an agency or commission is an indispensable requirement in statutory interpretation.

**IV. Agency Independence in the Context of Civil Rights Enforcement.**

**A. Introduction.** The above discussion has generally addressed the nature of protection against removal without cause for multi-member independent agencies. Not surprisingly, the issue of agency independence has played out in the specific context of civil rights agencies. On the

national level, a highly publicized battle royale occurred in the 1980s over the independence of the United States Commission on Civil Rights. *See* Garrine P. Laney, Cong. Rsch. Serv., RL34699, *The U.S. Commission on Civil Rights: History, Funding, and Current Issues* 5–6 (2008) [hereinafter Laney]. In Iowa, the need for an independent civil rights enforcement agency was recognized by the relatively few enforcement actions under the Iowa Civil Rights Act of 1884, which, as a criminal statute, required approval by an elected official before an action could be brought. *See* Arthur Earl Bonfield, *The Origin and Development of American Fair Employment Legislation*, 52 Iowa L. Rev. 1043, 1049 (1967) [hereinafter Bonfield]; Robert E. Goostree, *The Iowa Civil Rights Statute: A Problem of Enforcement*, 37 Iowa L. Rev. 242, 242–44 (1951) [hereinafter Goostree].

**B. History and Development of the Iowa Civil Rights Act.** Iowa had a civil rights act long before enactment of the federal Civil Rights Act of 1964. The original Iowa Civil Rights Act, enacted in 1884, provided potentially broad substantive protection against racial discrimination in Iowa. 1884 Iowa Acts ch. 105, § 1 (codified at McClain's Ann. Code § 5386 (1888)). But the statute was a criminal statute and, as a result, required that a prosecution be brought by an elected county attorney. *Id.* § 2 (codified at McClain's Ann. Code § 5387 (1888)) According to Arthur Bonfield, one of the leading proponents of the Iowa Civil Rights Act of 1965, prosecutions under the act with a county attorney as a gate keeper "ha[d] been very few or nonexistent." Bonfield, 52 Iowa L. Rev. at 1049. The reliance on elected county attorneys, with a mixed-bag of personal views on the act itself, meant that the will of the state legislature was continually thwarted by local officials. *See* Goostree, 37 Iowa L. Rev. at 245–48.

This problem of a lack in enforcement led the Iowa Legislature to enact the Iowa Civil Rights Act of 1965 which created the Iowa state civil

rights commission. 1965 Iowa Acts ch. 121 (originally codified at Iowa Code ch. 105A (1966), now codified as amended at Iowa Code ch. 216 (2019)). The act granted the commission the powers to "receive, investigate, and pass upon complaints alleging unfair or discriminatory practices." *Id.* § 5(2) (originally codified at Iowa Code § 105A.5(2) (1966), now codified as amended at Iowa Code § 216.5(2) (2019)). Shifting the power of enforcement away from the political position of local county attorney to a nonpartisan commission selected by the Governor allowed the enforcement of the civil rights act to be insulated from local politics and therefore an increase in complaints taken seriously. *See* Iowa Civil Rights Commission, *Biennial Report* 17–18 (1977–1978) (demonstrating cases handled by the commission increased five-fold between 1969 and 1977).

**C. Public Battle Over Independence of the United States Civil Rights Commissioners.** The Civil Rights Act of 1957 created the United States Commission on Civil Rights. Civil Rights Act of 1957, Pub. L. No. 85–315, § 101, 71 Stat. 634, 634 (1957) (originally codified at 42 U.S.C. §§ 1975-1975e (1958)). The Commission was empowered to investigate allegations, study and gather information on equal protection of the laws, assess federal laws and policies, submit interim reports, and prepare a report on final findings and recommendations to the President. *Id.* § 104, 71 Stat. at 635 (originally codified at 42 U.S.C. § 1975c (1958)). The President was empowered to appoint six members of the Commission with no more than three from the same political party. *Id.* § 101, 71 Stat. at 634. Notably, however, the statute did not contain a provision on removal of commissioners. *See* Laney, Cong. Rsch. Serv., RL3699 at 2.

In 1982, however, a debate occurred over the President's power over the Commission. *Id.* at 5. President Reagan nominated the controversial

Reverend B. Sam Hart to the Commission. *Id.* Hart's views on busing, the equal rights amendment, and gay rights made him a divisive pick in the eyes of civil rights groups including the National Urban League, the NAACP Legal Defense Fund, the National Organization for Women, the Mexican-American Legal Defense Fund, and the National Gay Task Force. *Id.* President Reagan withdrew the nomination, but he replaced two commissioners who refused to resign. *Id.* at 5–6. Further, in 1983, President Reagan sought the resignation of three commissioners who he believed opposed the administration's policies. *Id.* at 6. When they refused to resign, he purportedly fired them. *Id.* The attempt by President Reagan to fire commissioners led to a substantial debate about "the Commission's independence, who should appoint its members, and its mandate." *Id.* at 6.

In the end, a political compromise was reached in the United States Commission on Civil Rights Act of 1983. Pub. L. No. 98–183, 97 Stat. 1301 (originally codified at 42 U.S.C. §§ 1975–1980 (Supp. 5 1982)). Under the statute, the Commission had eight members. *Id.* § 2, 97 Stat. at 1301 (originally codified at 42 U.S.C. § 1975 (Supp. 5 1982)). Four were appointed by the President and two each by the President Pro Tempore of the Senate and the Speaker of the House. *Id.* The President could remove a commissioner only for neglect of duty or malfeasance in office. *Id.* The compromise enacted in 1983 led to a series of extensions of authorization of the Commission. *See* Laney, Cong. Rsch. Serv., RL34699 at 8–9.

The political struggle over the independence of members of the United States Civil Rights Commission and whether the President could terminate them over policy disagreements were highly publicized issues— particularly in Iowa. Mary Louise Smith, a prominent Iowa politician and chair of the Republican National Committee from 1974 to 1977, was

appointed by President Reagan as a vice chairwoman of the United States Civil Rights Commission in 1981.  *See* John Hyde, *Civil Rights Panel Filled; Smith Not Among Member*, Des Moines Reg., Dec. 13, 1983, at 2A [hereinafter Hyde, *Civil Rights Panel Filled*]; John Hyde, *GOP Women Protest Decision to Oust Smith,* Des Moines Reg., Dec. 5, 1983, at 4A [hereinafter Hyde, *GOP Women*]; John Hyde, *Smith Joins in Criticism of President*, Des Moines Reg., June 15, 1983, at 1A [hereinafter Hyde, *Smith Joins in Criticism*].

After the debate on the independence of the Commission, and shakeup of how commissioners were selected under the United States Commission on Civil Rights Act of 1983, neither President Reagan nor the majority Republican United States Senate decided to reappoint Smith as a commissioner—primarily because of a difference in philosophical opinion on the direction of federal civil rights and a refusal to unquestioningly carry out the demands of the Reagan Administration.  *See* Hyde, *Civil Rights Panel Filled*; Hyde, *GOP Women*; Hyde, *Smith Joins in Criticism*; Dewey Knudson, *Supporters of Smith Joined by Branstad*, Des Moines Reg., Dec. 6, 1983, at 3A.  The slighting of Smith set off a storm of protests from various groups of the Republican Party, Hyde, *Civil Rights Panel Filled*; John Hyde & James Risser, *Reagan Snub of Smith Triggers Iowa "Fallout,"* Des Moines Reg., Dec. 8, 1983, at 1A, and Smith criticized President Reagan's selection of new commissioners as affecting the "heart of the independence of the commission."  Hyde, *GOP Women*.  During the controversy over appointments to the Commission, then-Senator Joseph Biden, ranking member of the Senate Judiciary Committee, declared that the question at issue was not the qualification of President Reagan's nominees.  "The question at stake," according to Biden, was "the

independence of the commission." Robert Pear, *3 Reagan Rights Nominees Touch Off a Heated Clash in Senate*, N.Y. Times, July 14, 1983, at 12A.

Certainly Iowa legislative leaders would have been aware of the debate over agency independence given the direct involvement of a prominent Iowa political figure in the controversy. In any event, the controversy over the Commission's independence was well covered in the Des Moines Register and could not have escaped the attention of local political leaders, some of whom described the 1983 maneuvering as packing what was meant to be an independent Commission with loyalists of a particular ideology. *See* Hyde, *Civil Rights Panel Filled*; John Hyde, *Rights Panel Appointment Fuels Furor Over Smith*, Des Moines Reg., Dec. 9, 1983, at 8A; John Hyde, Commentary, *How Iowa Rates in Washington*, Des Moines Reg., Oct. 30, 1983, at 2C [hereinafter Hyde, *How Iowa Rates in Washington*]; *Civil Rights Panel Criticizes Education Cuts*, Des Moines Reg., July 13, 1983, at 6A; *Reagan Choices for Civil Rights Panel Draw Fire*, Des Moines Reg., July 14, 1983, at 4A. While chairwoman of the Commission, Smith commented to the Des Moines Register that "[c]ivil rights is far too serious a business to let it get caught up in political in-fighting." Hyde, *How Iowa Rates in Washington*.

**D. 1990 Amendment to the Iowa Civil Rights Act of 1965: Independence Is Important to Iowans.** The Iowa Civil Rights Act of 1965 as initially passed did not preempt the field and left open the ability for local governments to address civil rights not inconsistent with the act. 1965 Iowa Acts ch. 121, § 12. However, in 1989 and 1990, a dispute arose between the Des Moines City Council and the Des Moines Civil and Human Rights Commission—Des Moines's local civil rights commission. Jonathan Roos, *Panel Wants Large Cities to Keep Rights Agencies*, Des Moines Reg.,

Feb. 1, 1990, at 2A [hereinafter Roos, *Rights Agencies*]. The dispute threatened the independence of the local commissions. *Id.*

To protect the independence of local commissions, the state legislature amended the Act to require cities with populations over 29,000 to establish "an *independent* local civil rights agency or commission." 1990 Iowa Acts ch. 1166, § 1 (originally codified at Iowa Code § 601A.19 (1991), now codified as amended at Iowa Code § 216.19(2) (2019)) (emphasis added). The legislators who enacted this amendment were surely aware of the debate and understood the ramifications of using the term "independent." In fact, "[t]he legislation stem[med] primarily from a dispute involving the Des Moines City Council and the [Des Moines commission]" as well as "threats to the independence of civil rights agencies in other Iowa cities" which "included business leaders' attempts to kill local civil rights agencies, proposals to eliminate staff and threats aimed at directors." Roos, *Rights Agencies*; *see also Cities May Have to Have Civil Rights Agencies*, Des Moines Reg., Feb. 22, 1990, at 2A. One primary reason for the amendment, then, was the concern that the politics of city councils and mayors threatened the independence of local commissions. *See* Roos, *Rights Agencies*; *see also* David Congdon, Letter to the Editor, *Human Rights Commission*, Des Moines Reg., Feb. 5, 1990, 11A ("[The bill] if passed as law, will end the debate over the independence of [the Des Moines commission]."). Against this backdrop, it seems clear that one of the purposes of the creation of the Iowa Civil Rights Commission, and its local counterparts, was to remove the decision to prosecute from state or local politicians and vest the power in a nonpartisan, independent, commission.

**E. Conclusion.** The importance of the independence of civil rights agencies has been a highly visible issue in both state and federal law. The

battle over the independence of the United States Civil Rights Commission and the desire to escape the limitations of political control in the Iowa Civil Rights Act further support the notion that agency independence means protection from outside political influence—including a requirement of for cause termination.

## V. Application of History and Traditional Administrative Law Principles to Interpretation of the Iowa Civil Rights Act.

What is meant by an "independent local agency" is clearly ambiguous and is subject to interpretation, including consideration of the historical context of the statute. Given the above historical background and the emergence of "independent" as a term of art in administrative law, it seems to me the district court got it right when it determined that as an independent, multi-member commission where commissioners serve for a fixed term, a commissioner may be terminated only for cause.

This interpretation of the term "independent" in Iowa Code section 216.19 is consistent with the repeated and widespread usage of the term in administrative law over the past hundred years or so. As has been repeatedly noted in many cases:

> [I]t is a cardinal rule of statutory construction that, when [the legislature] employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken.

*Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248, 134 S. Ct. 852, 861–62 (2014) (alteration in original) (quoting *FAA v. Cooper*, 566 U.S. 284, 292, 132 S. Ct. 1441, 1449 (2012)); *see also Commonwealth v. Scott*, 982 N.E.2d 1166, 1169 (Mass. 2013) ("[Terms] that have acquired a particular meaning within the law should be read in a manner that is consistent with that meaning."); *McDonald v. N.C. Dep't of Corr.*, 724 S.E.2d 138, 140 (N.C. Ct. App. 2012) ("[W]hen . . . terms of art are used in a statute, they are

presumed to be used with their technical meaning in mind, likewise absent legislative intent to the contrary." (quoting *Dare Cnty. Bd. of Educ. v. Sakaria*, 492 S.E.2d 369, 372 (N.C. Ct. App. 1997))). Surely part of the cluster of ideas behind the use of the word "independent" in agency law is protection of key decision-makers from removal without cause.

Further, legislators must have been aware that the Iowa Civil Rights Commission was created to provide a more effective mechanism than criminal sanctions that required the exercise of discretion by an elected county attorney before an action could be brought. In other words, one of the purposes of forming a commission was to lessen the role of politics in civil rights enforcement. In addition, legislators were aware of the debate over independence of the United States Civil Rights Commission in the 1980s. The best interpretation is that the legislature used the term "independent" in its historic context and as a term of art in administrative law.

Further, this interpretation aligns the structure of local commissions with that of the Iowa Civil Rights Commission. Under the statute, the local civil rights agencies were to have the same power as the Iowa Civil Rights Commission. The Iowa Civil Rights Commission, of course, is an independent agency with for cause protection for its multimember commissioners. By using the term "independent" local agency, it seems clear the legislature wanted to have a similar body exercise the same powers at a local level.

The majority notes that its position aligns with Iowa Code section 7E.4. This section defines an independent agency as "an administrative unit which, because of its unique operations, does not fit into the general pattern of operating departments." The statute does not address, one way or the other, the issue of termination of commissioners without cause. It

simply describes how the operations of independent agencies fit in (or do not fit in) on the organizational chart.

The brittle textual argument offered by the majority does not persuade. It lacks historical context, a critical feature in statutory interpretation. Each step in the majority's analysis has a degree of appeal, but the cumulative result is contrary to the sweep of history and the meaning of agency independence as a term of art.

The impact of the majority's position also cannot be ignored. The Ordinance itself expressly authorizes the Davenport Civil Rights Commission to bring actions against the City. The City gets wind of it and the mayor seeks to fire commissioners. If this maneuver is permitted, the independence of the Davenport Civil Rights Commission, and all local civil rights commissions, would be shattered.

As a political actor, the mayor is subject to the influence of not just the City but housing developers and large employers who might be subject to commission investigation or proceedings. Political influence is, of course, a part of the democratic process, but what the legislature did not want is a local civil rights commission whose independence is compromised by the ability of the mayor to fire commissioners because they are considering bringing an action against a politically powerful or well-connected defendant even though the proceeding is authorized by law and potentially meritorious. Even if there are other appointing authorities in some jurisdictions other than the mayor—say a city manager or city council—they too will be subject to the larger political influences associated with city management.

At oral argument, counsel for Mayor Klipsch and the City of Davenport was asked whether members of the judiciary would be "independent" if they were subject to termination without cause by the

Governor. Counsel candidly responded with an unqualified "Yes," the only possible response consistent with his clients' position in this case. But does anyone really believe that members of the judiciary would be "independent" if they could be terminated at any time without cause by a political authority? Or that a local commission would be "independent" if it relied on the political will of the mayor? The words of Justice Sutherland for a unanimous Supreme Court resonate: "one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Executor*, 295 U.S. at 629, 55 S. Ct. at 874

And here is a question. What do we tell the complainants who might believe the City engaged in unlawful acts of discrimination under the local Ordinance? Do we tell them that the Davenport Civil Rights Commission would be "independent" in considering such claims when the mayor terminated commissioners without cause who were contemplating an enforcement action against the City?

The City relies on Iowa Code section 372.15 to permit intervention by political leaders in the work of the independent local commissions. This statute generally permits an appointing authority to remove those appointed to city offices. But the statute begins with the phrase "[e]xcept as otherwise provided by state or city law." In my view, the specific requirement of an "independent local . . . commission" in Iowa Code section 216.19(2) is just such a provision that overrides the general terms of section 372.15.

As noted at the outset, the cumulative result of this decision is to undercut the ability of local civil rights ordinances to provide effective relief. Persons represented by counsel will be aware of these pitfalls, but those who are self-represented may not. After today, unless there is a

provision in the local ordinance protecting the "independence" of the commission,[1] a sincere local commission might consider disclosing to citizens in a candid brochure or other publication that it only has the resources to bring a handful of cases, that a right to sue letter is not available for violations of the local ordinance, and that if the commission is considering bringing an action against the city itself, or another politically connected entity, the mayor can fire the commissioners to stop it. And though civil rights advocates supporting independent local commissions may have thought they got the job done in 1990, they will have to start over and take another run at it.

## VI. Conclusion.

For the above reasons, I would affirm the ruling of the district court denying the motion for summary judgment in this case.

---

[1]In addition, there is a question as to whether the Davenport Ordinance itself prohibits the mayor from removing a commissioner without cause. Section 2.58.040 of the Ordinance provides for the appointment of commissioners. Davenport, Iowa, Municipal Code § 2.58.040. They are to be appointed in a fashion "broadly representative of the community." *Id.* The mayor appoints the commissioners, who must be confirmed by the city council. *Id.* The Ordinance provides, however, that once appointed, "the term of appointment shall begin on December 1st and [shall] end two years later on November 30th." *Id.* Can the mayor end the term of an appointment in the face of the Ordinance declaring when the term "shall" commence and "shall" end? Doesn't this local Ordinance embrace, rather than reject, the notion that commissioners should be independent of political authority and that termination should be only for cause? Should the Ordinance be interpreted in light of the vast body of caselaw dealing with the issue of "for cause" termination of administrative agencies? The question of whether section 2.58.040 of the Davenport, Iowa, Municipal Code prohibited termination of commissioners without cause was not raised in this case. Clearly, however, Iowa Code section 372.15 permits a local civil rights ordinance to ensure the independence of the commission through its own termination provisions.